Jones, J.
 

 The petition, including the attached exhibits, is quite lengthy. Briefly stated, it pleads that on April 2, 1929, the firm of Otis
 
 &
 
 Company, as syndicate managers of a syndicate, sent letters to certain of their clientele informing them that they, as managers, were forming a syndicate to deal in shares of companies engaged in the steel industry, the syndicate to become effective as soon as a certain aggregate amount of subscriptions should be received and accepted by the syndicate. Each participant, in his proper proportion, was to share in the profits or proceeds of the syndicate and was obligated to pay for its expenses, commitments and losses. Each was, obligated to contribute proportionately to the extent deemed requisite by the managers and in the manner prescribed by them. Calls were to be made by the managers upon the participants ratably in such amounts as the managers deemed desirable. The subscription agreements provided that the managers were to “have sole direction of all Syndicate matters, with full discretion and unrestricted powers.” The managers were empowered, in their discretion, to buy and sell shares of stock, etc. They were given the power of exercising all the rights, privileges and powers pertinent to their ownership of shares. They were
 
 *12
 
 authorized to borrow money on account of the syndicate and pledge as collateral therefor the participants’ holdings in the syndicate. By the terms of the original agreement the syndicate was to expire on April
 
 2,
 
 1930, but the managers were authorized to extend the syndicate from time to time so that it would expire not later than a year thereafter; but the managers, in their discretion, could terminate the syndicate at any time.
 

 The requisite amount having been subscribed by various participants, the syndicate became effective under its terms, the defendant subscribing to a participation in the sum of $25,000, which was accepted by the syndicate managers. Thereafter, and prior to April 2, 1930, large investments were made by the syndicate managers in steel and iron stocks, with funds obtained by calls from the syndicate participants. The managers made seven calls, the sixth and seventh of which were ignored by the defendant, and the percentages therein not being paid by him his prorated shares were held by the managers as security for the non-payment of his delinquent calls. These two delinquent calls amounted to the sum of $3,750. After demand and notice for the amount due on his delinquencies had been given the defendant, and after his non-payment thereof, his proportion of the securities invested in were on August 31, 1932, sold at public auction, no acceptable offer having been made therefor on the stock exchange on the previous day. The syndicate managers caused public notice of the same to be published for two weeks prior to the sale, and the securities held by the syndicate applicable to defendant’s participation therein were sold to the best bidder for the sum of $1,923. This suit is for the recovery of $1,859.20, with interest from the day of sale, this being the balance claimed to be due on the defendant’s delinquent calls, less certain credits given the defendant, among which was the sum produced by the auction
 
 *13
 
 sale. The facts relating to the subscription contracts, the authority of the syndicate managers, and the extension of the life of the syndicate appear in two exhibits which form the contractual relations between the subscribing participants and the syndicate managers.
 

 In support of his demurrer the defendant in error contends that the syndicate terminated on October 2, 1932, and whatever powers the syndicate had ceased at that time; that this suit being brought in January, 1933, three months after the syndicate’s alleged termination, its powers, including that of bringing suit, had ceased. The original agreement of April 2, 1929, did provide that the syndicate should expire on April 2, 1930, but empowered the managers to extend the syndicate until April 2, 1931. On February 24, 1931, the foregoing agreement was amended, with the consent of the participants, authorizing the board of managers to extend the syndicate until October 2, 1932. While this limitation of time expiration denied authority to the managers to further act in the purchase and sale of steel securities — the main purpose of the participation agreement — it did not, nor was it intended to, control the time of liquidation of the syndicate or terminate its managers’ powers to distribute the stocks in their hands to the participants or to collect the indebtedness then due from the defendant on his delinquent calls. The stocks were bought in 1930. The calls for delinquent subscriptions were made in June and September of 1931, the defendant’s proportion of the participating shares being sold on August 31,1932, prior to the expiration of the agreement in the following October. Had the purchase and sale of the stocks been to the defendant’s advantage, obviously he would not advance the contention that the syndicate managers’ powers of distribution had ceased, or that he would himself have no authority to bring suit against
 
 *14
 
 the plaintiffs in error. The claim that this was a partnership arrangement cannot be upheld. Participatipn in the profits of a business is not decisive of that question. In order to constitute a partnership, the evidence must show that the person taking the profit shared in it as a principal in a joint business in which each had express or implied authority to bind the other.
 
 Harvey
 
 v.
 
 Childs and Potter,
 
 28 Ohio St., 319, 22 Am. Rep., 387;
 
 Southern Ohio Public Service Co.
 
 v.
 
 Public Utilities Commission,
 
 115 Ohio St., 405, 154 N. E., 365. Here no participant had authority, express or implied, to bind either the managers or any other participant. Each participant entered into a personal arrangement with the syndicate managers on his own account. That this was understood by all the participants in the venture is shown by the following clause in the participating agreement to which the defendant was a party: “Nothing herein contained shall constitute the parties partners, nor shall any participant be liable in any event beyond the full payment of the amount subscribed by him.” Although such a declaration is not' necessarily binding on one who is a stranger to the agreement, as between the participants themselves who signed the agreement it is binding.
 

 The1 syndicate managers were given wide and extensive powers over all syndicate dealings. No participant had a right to interfere so long as the syndicate managers carried out the agreement. The managers were authorized to make calls in such amount as they deemed desirable. They had full discretion and unrestricted powers over all syndicate matters. Undoubtedly they had the power to collect delinquent calls. At the expiration of the syndicate the managers were authorized to sell stocks remaining unsold in their hands or, in their discretion, to distribute them to the participating subscribers in proportion to their re
 
 *15
 
 spective liabilities at the time of such distribution. While not named as “trustees” in the syndicate agreement, they became trustees in fact for all the various participants and were subject to account to each of them if the syndicate managers were guilty of violating their agreement.
 

 This brings us to the question whether or not the plaintiffs, as syndicate managers, had the legal capacity to- sue for the uncollected delinquencies. Section 11244, General Code, provides, that a trustee of an express trust, a person with whom or in whose name a contract is made for the benefit of another, may bring an action without joining with him the person for whose benefit it is prosecuted. Counsel for defendant in error advance the argument that at most the plaintiffs in error are merely the agents of the syndicate and not trustees. If that be true, if the syndicate managers were mere agents, they would have the right to sue, since the contract was entered into in theii name.
 
 Davis
 
 v.
 
 Harness,
 
 38 Ohio St., 397; Pomeroy’s Code Remedies (5th Ed.), 166, Section 103. But they were not merely agents. Under the agreement they sustained a trust relation whereby they were to invest in these securities and account to each participant for the trust imposed upon them. While they were not named as trustees in the syndicate agreement, in law they became such and became bound to the various participants for the faithful execution of that trust. And they were trustees for an express trust, since the character of the trust and its operations were set forth in the participation agreements. In this case the bringing of actions for the collection of delinquent calls
 
 was incidental to other powers and duties under the assumed trust.
 
 This, therefore, distinguishes it from the case of
 
 Brown
 
 v.
 
 Ginn, Trustee,
 
 66 Ohio St., 316, 64 N. E., 123, where Spear, J., in denying a trust
 
 *16
 
 relation, on page 322, said: “And we conclude further, that, in order to constitute the party a trustee of an express trust within the meaning of section 4995, the right and duty, to bring an action must be incidental to other powers and duties under the assumed trust, and the authority not confined simply to the bringing of an action to collect the subject of the contract which purports to create the trust, and pay the net. proceeds over to the assignor.” Many states have statutes similar to Section 11244, General Code of Ohio. New York is one of them. Mr. Pomeroy, in construing the New York section, said of it: “The section of the New York code, when originally passed, contained but the first sentence as it now stands. Some doubt arose as to its meaning, and a judicial decision having held that the phrase embraced, among others, a person with whom or in whose name a contract is made for the benefit of another, the legislature, to remove all possibility of doubt, added this judicial language as an explanatory clause. The two forms of the provision, although their phraseology differs somewhat, mean exactly the same thing, and establish exactly the same rule.” Pomeroy’s Code Remedies (5th Ed.), 159, Section 99. A case very similar to this arose and was decided in the state of New York,
 
 Gallogly
 
 v.
 
 Whitmore,
 
 158 N. Y. S., 830. While this is a lower court decision, we refer to it only because, under the New York statute, syndicate managers were held to be “trustees” authorized to maintain actions to enforce payments of subscriptions. Under the authorities cited, therefore, we hold that the syndicate managers can maintain this action as trustees of express trusts, those trusts being specified in the participating agreements, and that the plaintiffs, as syndicate managers, had legal capacity to sue for the amount due on the delinquent calls. The demurrer to the petition on that
 
 *17
 
 ground should have been overruled by the trial court. In sustaining the action of the trial court, the Court of Appeals erred. The judgment of both courts will be reversed, and the cause remanded to the Common Pleas Court for further proceedings.
 

 Judgment reversed.
 

 Weygandt, C. J., Stephenson, Williams, Matthias, Day and Zimmerman, JJ., concur.